May 23-79-21 Galena Shelomentseva v. Computools, LLC Maybe before we start, you have a question. Council, before, we're going to do something a little unusual, just because we have this Can you hear? Sorry. Why don't we just start? I have a quick question for the Council, for the appellee. Before we start the clocks, we've had this baseline question about subject matter jurisdiction. And I hope that you've, well, let me start by saying this. We appreciate the supplemental letter briefs that each of you sent about the subject matter jurisdiction question. But we do, we did enter an order asking you each to be prepared to answer a follow-up question. Perhaps the Council for the appellee would be in the best position to immediately answer. Which is, we understand that Computools is an LLC with a single member, that's Mr. Tymchuk. And you informed us that he's a Ukrainian citizen. However, under 1332, the diversity statute, that's not enough for us to know the answer to the question of whether there's diversity. We also need to know whether he is a legal permanent resident of the United States. And if so, whether he is domiciled in New York. Is Council for the appellee prepared to make a representation to this court about the answers to those questions? Could you please step to the podium so we could all hear you? Because in particular, we do need to hear it through the microphone. No, of course. Thank you, Your Honor. My name is Dmitry Joffe. I represent the appellee, Computools. And in response to your question, Sergey Tymchuk, he's a resident and citizen of Ukraine. And he's not a legal resident of the United States. Perfect. That's, I think, all we needed to know on that question. That clears away one issue. So, thank you, Counsel. I believe we'll come back to you. Counsel, for the appellant, just so we understand the state of the record. My understanding from your supplemental filing is that you would ask that pursuant to Section 1653, your complaint be deemed amended on appeal to reflect these updated jurisdictional allegations that would provide for complete diversity. Am I correctly understanding that? Yes, that's correct, Your Honor. Yes. Very good. Okay. With that out of the way, I appreciate the information that both counsel have provided to us. And let us now proceed to our regularly scheduled arguments with all of the things that you each planned to say originally. May it please the Court. I'm Robert Greener. I'm representing the appellant plaintiff in this matter. As you know, on a motion to dismiss, the standard of review is de novo. And there are four questions that have been presented in this appeal regarding the error that was committed by the lower court in interpreting the contract documents that is subject of the case. What provision of the agreement do you contend was breached? Our argument is that the agreement is silent on definitions as to what a business analysis is, what was required to be done. But if a contract doesn't require something because it is silent, how can you say that what was not done was a breach? Well, Your Honor, it's not silent. The part of the problem of this case is that there is a specific provision in what's called the vision document. But that comes after and isn't part of a contract. I don't And even if that vision document does what you say it should, how does that amount to a breach of a contract of which it was not part? Well, looking at the totality of the circumstances, it's clear that the appellant hired this company to create a unique prototype. But he didn't make a contract to that effect. It didn't say it had to be unique. And my problem is if there was a copy and they didn't do it because there was a copy, there might well be an argument that they breached. That is, if they didn't do what they did, given the copy, that might well have been a breach. Well, taking that interpretation, Your Honor, that would completely gut the point of this agreement. There's an 80-page specification document, which we argue should be included and integrated into the master service agreement. Because the master service agreement at section 1.1 clearly defines contract documents in the plural. It does not specify which particular documents would be considered contract documents. Well, hang on. Let's just walk through that. So you're referring us to 1.1. This is on page A63 of the appendix?  So let's just walk through this methodically so we're following you. It says here that the service provider shall provide software development and consulting services for the client, right? Yes. And then it says a detailed description of such services shall be determined by the specifications, which are the respective additional agreements to the service agreement as its integral parts, right? Yes. And we have the additional agreement on page 70, which is specification 1, right? Labeled additional agreement. And then going back to 1.1, it says the scope of services is strictly limited to the content of respective additional agreement, correct? Correct. So that means it's got to be covered by page 70, the additional agreement, or it's not part of the contract, right? No, Your Honor. And the reason why that's not correct is because it doesn't specify in that paragraph that specification document number 1 is the only additional document. Well, it says, these are capitalized terms, the scope of services is strictly limited to the content of respective capitalized additional capitalized agreement. And there is only one additional agreement, which is two pages long, that's on pages 70 and 71, correct? You're saying that last sentence, we should disregard that the scope of services is strictly limited to the content of respective additional agreement? That we disregard that sentence? I'm not saying we should disregard it. I'm saying that there's ambiguity there because the provision, the paragraph, sorry, the sentence before that refers to documents in the plural. Right, and that's a second document on page 70 to 71. But that also includes the vision document. If I could, if that was meant to be specifically limited to the specification document number 1, it would have said that. But it doesn't. No, it says additional agreement. But it's in conflict. I'm sorry. Go ahead, please. The last sentence. Yes. Of paragraph 1.1 said the scope of services is strictly limited to the content of respective additional agreement. There is only one document that has captioned additional agreement. So are you telling me that the last sentence does not mean what it says? No, Your Honor. What I'm saying is that's in conflict to the previous sentence, which refers to integrated documents in the plural, anticipating there could be multiple. But all that means is that there might have been more, and then the next sentence says, but this is the only one. And let me add, the second sentence that you're saying is in conflict says a detailed description of such services shall be determined by the specifications which are the respective additional agreements, additional agreements capitalized to the service agreement as its integral parts. So that sentence refers you to the capitalized additional agreements of which there is only one. Right. Describe to me how those two sentences are in conflict when both specifically refer only to pages 70 and 71 and say that is the limit of the contract. Taking your argument- It's not an argument. I'm telling you, read those sentences and tell me how they mean something other than that the contract is limited to what's set forth in pages 70 and 71. Yes, Your Honor. Diagram those sentences for me.  If I concede your point on that, if we do look at that terms of service- When you say you concede my point, you're agreeing- No, for the point of argument. For the point of argument. I am not making an argument. I'm asking you for your interpretation. My interpretation, Your Honor, remains the same, is that I think that they are in conflict because- How are they in conflict? Great. Because the one before it is referring to multiple documents that could be considered part. But it never specifies only specification one.  The multiple documents are defined terms as additional agreements. Would you agree? I agree that it would be additional agreements, yes. With the capitalized letters, right? So it's a defined term, right? Yes. What other additional agreements with capitalized letters are there other than the ones on pages 70 and 71? My argument, Your Honor, is it's a division document because otherwise- Your argument is that the division document must be read as an additional agreement even though it is not specified as such. Yes, Your Honor. In the second one. Yes. And if I could, just if you look at terms of service, there is no definition on that document, 7071, as to what a business analysis and UX prototyping means. They would be ambiguous terms if you didn't have the division document- That's a different argument. That goes to what the division document says. Right. And I have problems with that, too, but it's a different argument from whether a division document comes in at all. Yes. And we did raise that argument in our brief that without that, then these terms, again, are ambiguous and undefined, and the court chose to find that software services did not include an in-depth marketing analysis, which is what the plaintiff argues. But even if we treated the vision document as a part of the party's agreement, what is the specific provision that you contend was breached? Deep research and business analysis does not, on its own terms, connote research into, for example, what somebody else is doing. I, once again, respectfully disagree with you, Your Honor. I think that's the whole point of the business analysis, is to see what's in the market as far as product, who the potential competitors are to the product that they're developing, so that they can understand what the effect of release of the software they develop in the market will have. That's the whole point of, and if we look at the vision document itself, it says that in purpose. Has that obliged your adversary to do research into the existence of a comparable company or programming in Australia? Well, considering that this is a very limited space, number one, so $11 million- But you're saying these are people hiring nannies in different continents, halfway around the world. In what world does this language oblige for $4,000 the defendant to investigate what service providers might be doing or not doing in Australia? Well, the fact that the main engineer was based in Australia, she could have easily discovered this and brought that to the attention. Yeah, no, my problem is that if we read this as the kind of extra duty that you are telling us, it's hard for me to understand what the contracting party could have known he was agreeing to. They were agreeing to. They would seem to be agreeing to the world, and I don't know that that would be a valid contract. That's my point. It's ambiguous, your honor. And the district court interpreted it to mean that it didn't require that they do an in-depth analysis of the market for this particular product. Not all markets, but for this particular product. And an $11 million purchase for child care website is a pretty big thing in the marketplace. So that would have been something that would have definitely weighed in on my client's decision to move forward with it. You've reserved three minutes for rebuttal. Thank you, your honor. Why don't we hear from counsel for the appellee, Mr. Jaffee. Good morning, your honors. Again, I may please the court. There was one contract that my client signed with the police. That was contract to build a prototype of their website using their child match design. And they did it. Within three weeks, as the contract contemplated, they charged $4,000. They spent 40 hours, and they delivered the prototype. In your view, what does the word business analysis mean? A business analysis, just based on the definition provided by the appellants in their brief. It's figuring out the client's needs and providing the solutions for those needs. In this particular case, it's a software development company. So they've analyzed the child match system that the client wanted to build. And they built a prototype based on that. If they had copied, if they had intentionally copied something else in Australia, would that plausibly be a violation of the contract? Or would that be simply fulfilling the contract in a cheaper way? It's, yeah, in a hypothetical. I don't think they did that. But in a hypothetical scenario, they were supposed to build the prototype. And they built the prototype, even if they looked at the design of another company. There is no evidence that they looked. There is no evidence that they've looked. And she discovered, actually, the evidence to the contrary. Well, there's not a question so much of evidence, because we're at the pleading stage, right? Right, right. So the question is whether there's an allegation that she looked, right? The contract doesn't say you have to create a prototype that is unique in the world. And there is nothing like that. And there is no website that looks like that. It doesn't say that. It says that's what you want to do. And they worked together with the appellants, with Sheila Mansilla. She alleged in her original complaint that she spent hours and hours working with the designer to build this prototype. It was built. It was delivered. It was accepted with no complaints. And then, only then, after that, the parties discussed going forward, building the actual website, doing the actual coding, and building algorithm, and so forth. And with respect to that future project, my clients delivered the vision document. It's not a contract. It doesn't look like a contract. It doesn't have consideration, parties, bargaining, or exchange of promises. When was the vision document entered into relative to the initial? It was in June. The prototype was delivered on April 27th. And then in June, the vision document, which is an 80 page, and the district court correctly determined. It's just a blueprint for building the actual website. So that's something that was created after the full completion of the original contract? It was created after the completion of the original contract. And in fact, it includes the prototype. If you go in the vision document on page, it's actually in the appendix on page 185. There is a hyperlink. It's already built in the vision document. If you click on that hyperlink on page 185 of the appendix, it will get you to that prototype. So the vision document was, as the district court properly determined, was a blueprint for actually building the actual website. So the timing was, they had the contract on April 10th, they delivered prototype on April 27th. Then in June, they gave them a vision document, which is not a contract. It doesn't have any binding obligations on my client. And the, sorry, appellant then disappeared for two years looking for money. And two years later- I suppose if it had been pled that your client literally replicated somebody else's work product and did nothing independent, I suppose at that point you could read the agreement to have been breached insofar as the agreement- I would- Requires some affirmative- I would say good faith or something like that. Your point is that's not alleged? It's not alleged at all. And by the way, many of the arguments that, and I've made it in my motion, many of the arguments that appellants are raising here were not raised before the district court. There was not a single word ambiguous or ambiguity anywhere in the district court papers by appellants. They didn't argue the ambiguity. They didn't argue business analysis issue, that that wasn't. And so all these arguments that, well, predominantly the arguments that the appellants are raising now were not preserved. And which makes this appeal frivolous because they're also meritless. Thank you. Thank you. Thank you, Ronis. Thank you very much. Mr. Greener, you've reserved three minutes for rebuttal. Thank you. Could I ask you to clarify if this is following up on a couple of questions that my colleagues asked? It is not my understanding that the complaint alleges that CompuTools literally did no work and simply handed your client a copy of somebody else's website, right? Your claim is that what they provided to your client is simply not original and is far too similar to a product that was already out there that it thereby does not comply with the terms of the agreement, and am I fairly characterizing your claim? Correct, and if you go to that hyperlink- Speak into the microphone. I'm sorry. If you go to the hyperlink that council had mentioned, that is a static website. It's not a UX prototype. UX prototype is actually a functional beta. And- I'm sorry, what hyperlink are you talking about there? The council mentioned, he mentioned in his argument- Which one? That in my vision doc, sorry, in the vision document, if you go to the hyperlink, it shows that there was an existing prototype. That's not, it's a static page. The UX prototype called for in the service agreement would have been what had been built by the vision document. That's what the UX prototype would have been. And just to adjust Judge Calabrese's argument- But you're saying that when your client paid the final payment, so she paid the full 4,000, she didn't have the prototype yet? I'm not following you. No. Just clarify that for me. What the prototype was, was an outline of what they were going to do for her. The vision document is what they would have delivered, and the vision document- Did she get what she had paid for? Yes, that she did. Hang on. Did she get what she had paid for as of the time of her final payment of the remainder of the $4,000? Yes, for that phase. Correct. Just as I was about to say, Judge Calabrese raised the point that if they had taken somebody else's design to save money or time, that would cause a liability to my client on the patent. Because if we were to adopt that, and then they knew that, they were taking it from a different party and using it as a solution for her, that could have created liability down the road on the patent if we had tried to go to the patent office. And either it came up as prior art, and therefore not patentable, or if it had gotten through, that company could have came and sued her for patent infringement. So taking the totality of the circumstances, the whole agreement, the underlying understanding has to be that it has to be a unique product. Or else, why spend the money with them? She could have just gone to GoDaddy and created her own website there. She didn't need them to design this thing based on her specific designs. Thank you, Your Honor. I see my time is almost up, unless there's any other questions. No, thank you both very much. I could. I do have 40 seconds to address the frivolous argument. I just wanted to mention that that's not true on pages A, 140 through 158 is the memorandum in opposition to the motion to dismiss. On page 9 and 10, I clearly indicated that there was an argument regarding the underlying intention to create a unique prototype and that they were obligated under the business analysis to do the market research. And in fact, that's the reason why the court made that a prime part of its decision, and they recognized that. And then finally, that was contained in the argument of Galina at A158 through 166. She clearly claims that she intended for a unique prototype and that they were supposed to conduct the market research to find that out. So it's not frivolous. Thank you, Your Honor. Thank you to all counsel. We will take this case under advisement.